Van Voorhis, J.
Testatrix was a sister of Mortimer Regensburg and Melville E. Regensburg. Davis M. Zimmerman was her brothers’ lawyer. She, in her will, gave her residuary estate in trust to these three men for the life use of her son, Jerome M. Ahrens, as income beneficiary, “ provided always, however, that if my Trustees shall deem it advisable they may pay over to my said son, Jerome M. Ahrens, at any time or from time to time, the whole or any part of the principal of the said trust.” Upon the death of Jerome M. Ahrens the corpus of this trust was to pass to his children.
This will was executed in 1937. The testatrix died the following year survived by her son, Jerome M. Ahrens, and his son, Jerome M. Ahrens, Jr., thé latter then being ten years of age.
Ethel Ahrens, the mother of said infant, and Jerome M. Ahrens, Sr., were divorced prior to the death of the testatrix. Ethel Ahrens, as general guardian of Jerome M. Ahrens, Jr., has instituted this proceeding for a compulsory judicial settlement against the three testamentary trustees above named. It has been denied by the Surrogate for the reason that in 1939, as the Surrogate has found, they paid over the entire corpus to Jerome M. Ahrens, Sr., under the will, from which it has been contended successfully that nothing is left to be accounted for to the remainderman.
Complications arise from the circumstance that the principal part of the assets of said trust consisted of thirty-five shares of the capital stock of E. Regensburg & Sons, which had a book value of $158,000 in 1938 when testatrix died. That was a closely held family corporation of which Mortimer Regensburg and Melville E. Regensburg were officers and directors. They had received money from this corporation for their personal use in excess of $1,130,000 which they were legally obligated to restore. They were legally liable as directors to pay back $2,100,000 more that had been paid to their brothers Isaac Regensburg, Bellette Regensburg and Jerome Regensburg, who were also directors (cf. Stock Corporation Law, § 59). Evidently these personal liabilities to the corporation were treated as assets in computing the book value of the thirty-five shares owned by testatrix.
It is at once perceived that Mortimer and Melville E. Regensburg were in a delicate position. As executors and trustees under their sister’s will, they were under a duty to proceed against themselves and their brothers, as individuals, to compel them to make good these overdrafts to the corporation. They *476 had to get rid of the thirty-five' shares in the testamentary trust in order to extricate themselves from that situation. There was a simple method of doing this, lying ready at hand. In 1934, possibly in view of the- existence of these overdrafts, an agreement had been entered into by all of the stockholders, including testatrix, which required that each- stockholder, including testatrix, before selling to outsiders, should offer his shares at book value to the other stockholders, and, in the event of their failure to purchase, then to the corporation. This agreement expressly provided that in event of the death of any stockholder, his or her shares would be offered at book value to the other stockholders or the corporation. .Although the agreement provided that if the stockholders or the corporation did not exercise the option to purchase, the shares might then be sold to outsiders,-at least the effect was the same as though the obligation to buy on the part of the other stockholders was absolute, since they were the persons who would be defendants in a stockholder’s suit to compel repayment of the overdraft.- It was the duty of the trustees to bring such an action unless the other stockholders purchased these thirty-five shares. at book value, as they certainly would have doné if they, had thought that the trustees seriously intended to' proceed as indicated. Evidently neither the-stockholders, including the two Regensburg brothers who were testamentary trustees, nor the corporation, wished- to pay $158,000 — the then book value — for testatrix’ thirty-five shares. As has been pointed out, the book value was built upon the assumption that the liability to the corporation of the other members of the family — testatrix had not participated in the overdrafts — amounting to upwards of $3,200,000, would be met. It was clearly the duty of these testamentary trustees to obtain the book value of these shares and they and the other stockholders were not justified in objecting to paying a price computed on the basis that their unlawful withdrawals from the corporation would be restored. The unwillingness of the Regensburg brothers, who had participated in these withdrawals, to abide by the agreement made with their deceased sister, who had neither received nor become responsible for the repayment of any such money, appears to lie near to the roots of this controversy. These shares were afterwards transferred by a procedure hereinafter described for $120,000 on less favorable terms to some of the other stockholders and their wives, who should have purchased or participated in purchasing at a figure in the neighborhood of $158,000 pursuant to the stockholders’ agreement.
*477 Mortimer and Melville E. Regensburg evidently neither desired to purchase nor to participate in purchasing at book value, nor to proceed as trustees to compel themselves and the other stockholders or the corporation to buy at book value, nor were they willing as an alternative to sell to outsiders at a price computed after taking into account the right to maintain a $3,200,000 representative action against themselves and the other officers and directors. Such a suit could have been forestalled by purchase of the shares from the trust estate at their book value pursuant to the agreement, which was binding on and inured to the benefit of testatrix’ estate. The logic of the situation appeared to require that the trustees maintain such a suit or else insist upon a sale of the shares at about $158,000.
They sought to escape from these alternatives, however, by another route, by exercising the power of invading, the principal, conferred on them by the testatrix for the benefit of Jerome M. Ahrens, by ending the trust and paying the corpus over to him. That was something which they were to do under the will if they deemed it advisable. The advisability, no doubt, was to be measured by the Avelfare of Jerome M. Ahrens, Sr., and of his son, Jerome M. Ahrens, Jr., the remainderman, in the light of whatever surrounding circumstances there might be bearing upon the due and proper administration of Carrie Ahrens’ estate. Her will is not to be construed as meaning that her trustees were to pay over the corpus A\hen they deemed it advisable from the vieAvpoint of their oavu personal interests. The Surrogate is probably correct in stating that the testatrix knew of the adverse interests of her trustees when she named them, and was willing that they should act notwithstanding that they had such adverse interests. In naming them she evidently believed that they would lay these aside in handling her estate. From the fact that she understood this situation, however, we are not to infer that she named them as trustees for the purpose of having them act for themselves rather than for her beneficiaries. Neither Avere they absolved from the duty of trustees to take the affirma-, tive in showing that they have acted disinterestedly and Avholly for the Avelfare of the trust estate. Ordinarily, if they had conflicting interests, they would not be allowed to act at all. Here the knoAvledge of the testatrix of that fact may have justified them in accepting the responsibility of trustees, but instead of relieving them from the burden of going forAvard by showing to the beneficiaries that their administration of the trust was disinterested, that became even more necessary.
*478 The trustees appear to have used their discretionary power so as to exact concessions from Jerome M. Ahrens, Sr. At first they offered to turn the principal of the trust over to him on condition that he give releases, not only to them as trustees of his mother’s estate, but also to them individually and to their brothers and all “ former and present officers, directors and stockholders of E. Regensburg & Sons, Inc.” This would have extinguished his right to bring a minority stockholders’ suit, and would have diminished the book value of his shares by eliminating, so far as he ivas concerned, the liability of the officers and directors as an asset of the corporation. Ahrens, Sr., refused to do that, and would not accept the corpus on those terms. He did make, however, what it is reasonable to conclude was a counter offer — namely, to create an inter vivos trust out of these shares, with Mortimer Regensburg and himself as trustees. That idea appears to have been regarded as persuasive by the trustees, ostensibly for the reason that it afforded some protection to J eróme M. Ahrens, J r., but mainly, one is compelled to believe, for the reason that it gave to Mortimer Regensburg joint control over this stock with Ahrens, Sr. This not only had the effect of hindering the commencement of a minority stockholders suit against the officers and directors of E. Regensburg & Sons, Inc., if Ahrens, Sr., would have chosen to bring one, but it also prevented him, without the consent of his cotrustee, from selling these shares to outsiders, who might have been inclined to maintain such a suit. An endeavor to sell to outsiders would have been the leverage to compel the stockholders, if they were hesitant to carry out the stockholders agreement of 1934, to purchase these thirty-five shares at the book value of approximately $158,000 instead of for $38,000 less according to the arrangement which subsequently evolved.
A moment’s reflection reveals that the avowed purpose of the inter vivos trust to protect Ahrens, Jr., was not genuine. He would have been better protected if the trustees had paid over part only of the principal of the trust, under testatrix’ will, to -Ahrens, Sr., and had retained the rest which, on the death of Ahrens, Sr., would have gone to his son more simply and effectively under the provisions of testatrix’ will in accordance with her design. Hot only was the idea of the inter vivos trust devised before the corpus was paid over to Ahrens, Sr., but the two transactions were consummated simultaneously. In- fact, an attorney for the Regensburg’s himself prepared the trust agreement and attended to its execution so carefully that the stock certificate never passed out of his own hands, but was *479 laid on the table for Jerome M. Ahrens, Sr., to endorse along with signing the inter vivos trust agreement, which he did, as he was bidden.
Without doubt, Ahrens, Sr., knew what he was doing when he signed these papers, and did so in order to obtain for himself and his second wife (he remarried in 1942) a larger share of the corpus of his mother’s trust fund than would have been the case if his uncles had not found it “ advisable ” to turn it over to him.
The point is not that Ahrens, Sr., failed to act with his eyes open, but that the circumstances point strongly to the conclusion that he was dealing with his uncles on a basis of mutual self-interest, and that they invaded the corpus as a result of a bargain between them. If part of the animating purpose of the transaction was to make it safer for the trustees to avoid the alternative of themselves bringing a stockholders representative action, or to avoid insisting upon a purchase by the stockholders or the corporation at book value under the stockholders’ agreement, or a sale to outsiders, then what was done exceeded the power contained in the will, which authorized the invasion of the principal of the trust for no such object. As fiduciaries, they were duty-bound completely to lay aside their personal advantage and to deal disinterestedly for the benefit of the objects of testator’s bounty. Unless the trustees invaded the principal by paying it over to the life beneficiary solely for his advantage, having in view the circumstances of the remainderman, they had no right or power to invade it at all, and the situation is to be regarded as though no invasion had taken place. Testator, in her will, referred to the stockholders agreement of 1934 and indicated clearly that she expected it to be carried out. In that view of the case, nothing that was later done by Jerome Ahrens, Sr., or the Regensburg's, in connection with the creation of the inter vivos trust or the option for the purchase of the shares, can have any effect, except that equity requires that upon restoring the thirty-five shares to the trust credit should be given for moneys actually paid to Ahrens, Sr.
In a situation where the personal interests of the trustees were present to such an extent, even though that fact may have been known to the testatrix, the trustees in exercising their discretion to terminate the trust might well have invoked the approval of the Surrogate under section 40 of the Surrogate’s Court Act on notice to the remainderman as well as to the life beneficiary.
Instead of sustaining the burden of establishing their own disinterestedness, the trustees have gone far to prove the contrary.
*480 The thirty-five shares of E. Regensburg & Sons, Inc. stock are .still intact and can readily be restored to the trust fund established by article V of the will, which now vests in possession in the remainderman, subject to a lien in favor of Mortimer and Melville E. Regensburg and their wives and other members of the family for whatever moneys they personally had paid to Jerome M. Ahrens, Sr., as a result of these intricate transactions. This stock should go to the remainderman subject to the original stockholders’ agreement, pursuant to which the Regensburg brothers or the corporation can, apparently, still buy these shares at their book value and apply the above-mentioned credits against the purchase price.
Not all of the above-described persons are parties, and it may be necessary to bring them into the accounting proceeding to be had before the Surrogate, in order to adjust the equities.
Enough has been shown to require these testamentary trustees to account to the remainderman, Jerome M. Ahrens, Jr., by his general guardian.
The decree should be reversed and the matter remitted to the Surrogate to conduct an accounting in accordance with this opinion.